UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and STATE OF TEXAS, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF TYLER, TEXAS, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )    Civil Action No. 6:17-cv-29 <br>    Judge John D. Love |

## PLAINTIFFS' UNOPPOSED MOTION TO ENTER THE CONSENT DECREE

Plaintiffs, the United States of America ("United States") and the State of Texas ("Texas"), respectfully move the Court to approve, sign, and enter as a final judgment the proposed Consent Decree in this action. The proposed Consent Decree was lodged with this Court on January 17, 2017 (ECF No. 2-1), the same day that the United States and Texas filed this civil action against the City of Tyler, Texas ("Tyler"). Entry of the Consent Decree will resolve the claims alleged in the Complaint. ECF No. 1 ("Compl.").

The proposed Consent Decree provides that the United States and Texas each reserve the right to withdraw or withhold consent to the settlement if comments by the public disclose facts or considerations that indicate that the Consent Decree is improper, inadequate, or otherwise inappropriate. Consent Decree ¶ 145. After lodging the Consent Decree with the Court, the United States and Texas each published notice of the Consent Decree and provided a 30-day public comment period. *See* 82 Fed. Reg. 8435 (January 25, 2017); 42 Tex. Reg. 327 (January 27, 2017). The United States' public comment period ended on February 24, 2017, and Texas' public comment period ended on February 26, 2017.

1

As discussed below, the United States received a comment from a resident of Tyler and considered the comment to determine whether it disclosed facts or considerations indicating that the proposed Consent Decree is inappropriate, improper, or inadequate. The United States consulted with Texas and determined that the comment does not disclose any such facts or considerations. *See* p. 13-15, *infra*.

Defendant consented to entry of the Consent Decree without further notice. Consent Decree ¶ 145. As set forth in this Motion, the proposed Consent Decree satisfies applicable standards for entry. Therefore, Plaintiffs respectfully request that the Court sign (in the space provided on page 82) and enter the Consent Decree as a final judgment in this matter. In accordance with Local Rule CV-7, the proposed Consent Decree is attached to this Motion as a proposed order.

## BACKGROUND

On January 17, 2017, Plaintiffs filed a complaint against Defendant seeking injunctive relief and civil penalties for violations of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251-1388, and the Texas Water Code ("TWC"). ECF No. 1. Congress passed the CWA with the objective to "restore and maintain the chemical, physical, and biological integrity of the nation's waters." 33 U.S.C. § 1251. The federal claims arise under Sections 309(b) and (d) of the CWA, 33 U.S.C. §§ 1319 (b) and (d), and allege violations of Sections 301(a) and 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342. Similarly, the Texas legislature passed the TWC to maintain the water quality of the State. Tex. Water Code § 26.003. The State claims arise under TWC Sections 7.032, 7.102, 7.105, and 7.108, Tex. Water Code §§ 7.032, 7.102, 7.105, and 7.108, and

allege violations of TWC Sections 7.101 and 26.121(a)(1), Tex. Water Code §§ 7.101 and 26.121(a)(1).

Tyler is a municipality that owns, operates, and controls two Publicly Owned Treatment Works ("POTWs"), as that term is defined by Section 212 of the CWA, 33 U.S.C. § 1292, and by regulations issued by the United States Environmental Protection Agency ("EPA") and codified at 40 C.F.R. § 403.3(q). Tyler's POTWs manage and treat municipal sewage and liquid industrial wastes. Compl. ¶¶ 18-19 and 34-35. Each POTW includes a system that collects wastewater, including raw sewage, and conveys it for treatment—known as a wastewater collection and transmission system ("WCTS"). Tyler's WCTS conveys wastewater through piping (Tyler uses both "gravity sewer lines" (sloped downwards from the source and relying on gravity to create flow), and "force mains" (pipes relying on pressure created by pumps or compressors located in "lift stations") manholes, lift stations, and other conveyances. In the filings in this case, Tyler's two WCTSs are referred to collectively as "the WCTS." Each of Tyler's POTWs also includes a plant that treats the collected wastewater, known as a wastewater treatment plant ("WWTP"). Compl. ¶¶ 36-42.

CWA Section 301(a), 33 U.S.C. § 1311(a), and Tex. Water Code § 26.121(a)(1), prohibit discharges of pollutants into waters of the United States or into or adjacent to any waters of Texas, unless authorized by permit. Compl. ¶¶ 13-17 and ¶¶ 24-27. CWA Section 402(a), 33 U.S.C. § 1342(a), provides that EPA may authorize the discharge of pollutants by issuing permits, known as National Pollution Discharge Elimination System ("NPDES") permits. Compl. ¶¶ 13 and 20. Pursuant to CWA Section 402(b), 33 U.S.C. § 1342(b), EPA authorized the Texas Commission on Environmental Quality ("TCEQ") to issue such permits in Texas. Compl. ¶¶ 21 and 28. *See* 63 Fed. Reg. 51164 (September 24, 1998). Discharge permits issued

by Texas are known as Texas Pollution Discharge Elimination System ("TPDES") permits. *Id.* ¶ 1. Texas issued TPDES permits to Tyler for each of its POTWs ("the Tyler Permits"). *Id.* ¶ 46. The Tyler Permits require Tyler to comply with specified terms and conditions including a requirement that the POTWs, including both the WCTS and the WWTPs, are properly operated and maintained at all times. *Id.* ¶ 56.

The Complaint in this case alleges that Tyler failed to properly operate and maintain the WCTS in violation of the requirements of the Tyler Permits and specified provisions of the CWA and TWC.  *Id.* ¶¶ 90-125. Specifically, Tyler operated and maintained the WCTS in a way that allowed a substantial number of blockages, structural defects, line breaks, or other deficiencies to form, which, in turn, caused raw sewage to be released from the WCTS at locations that were not authorized by the Tyler Permits. *Id.* ¶¶ 57-61; 92. Such releases from the WCTS potentially expose the public to raw sewage and are known as sanitary sewer overflows ("SSOs"). *Id.* ¶ 60. The Complaint further alleges that some of the SSOs resulted in raw sewage flowing into waters of the United States (*Id.* ¶¶ 66-74; 97-102) and into or adjacent to waters of the State (*Id.* ¶¶ 75-77; 105-110). In addition to SSOs caused by blockages or defects in the WCTS, the Complaint also alleges that at several locations within the WCTS Tyler created or allowed to remain pipes and/or other materials that were connected in a manner that would facilitate SSOs. Such locations are referred to as "Constructed SSO Locations." *Id.* ¶¶ 62-65.

The Tyler Permits also require Tyler to report SSOs and to install adequate safeguards to prevent SSOs during electrical power failures. The Complaint alleges that Tyler failed to comply with these requirements. *Id.* ¶¶ 78-89; 114; 120-121.

**TERMS OF THE SETTLEMENT**

Entry of the Consent Decree as a final order will resolve all claims alleged by Plaintiffs in the Complaint. The terms of the Consent Decree were negotiated by the Parties with the goal of Tyler eliminating SSOs and Constructed SSO Locations and achieving compliance with the CWA, TWC, and the Tyler Permits. Consent Decree ¶¶ 7-8. To achieve this goal, the Consent Decree requires Tyler to undertake specified WCTS condition assessments and engineering analyses to identify and implement remedial measures designed to bring its WCTS into compliance with the CWA, TWC, and the terms and conditions of Tyler's TPDES permits, including removal of any additionally discovered Constructed SSO Locations. The Consent Decree requires Tyler to complete these remedial measures within ten years after entry of the Consent Decree as a final order.[1] *Id*. ¶ 11.

The Consent Decree also requires Tyler to develop and implement a comprehensive Capacity Management, Operation and Maintenance ("CMOM") Program. Tyler must finalize and implement the CMOM Program within one year after entry of the Consent Decree as a final order. *Id*. ¶ 13-16. The Consent Decree's CMOM program will cover procedures for: improving employee training (¶¶ 19-20); responding to SSOs (¶ 21); reporting and documenting SSOs (¶¶ 22-27); enhancing routine cleaning practices across the WCTS (¶¶ 28-30) and requiring more frequent cleaning of areas experiencing recurring SSOs (¶¶ 31-33); inspecting the WCTS on a specified schedule to determine its current condition (¶¶ 34-37); implementing a preventative maintenance program for lift stations (¶ 38); developing and implementing programs for controlling both the buildup of fats, oils, and grease buildup in the WCTS (¶¶ 39-40) and the

---

[1] When conducting mandated inspections, cleaning, or remedial measures, Tyler must prioritize the sequencing of its work based on consideration of sound engineering practices, Tyler's best professional judgment, applicable industry standards, the location of SSOs in low income and minority census tract communities, and other appropriate specified factors. Consent Decree ¶ 12.

intrusion of roots into the WCTS (¶¶ 41-43); and developing and implementing an updated information management system (¶¶ 44-49).

In addition, the Consent Decree requires Tyler to model potential capacity constraints within its WCTS (*i.e.* parts of the system where the system is undersized for expected flows) and assess identified capacity concerns through field verification. Consent Decree ¶¶ 50-53. For all capacity constraints confirmed via field verification, Tyler must develop a remedial measures plan that includes a schedule for completing all identified remedial work to eliminate the capacity constraint within ten years after the date of entry of the Consent Decree as a final order. *Id.*¶¶ 54-55.

Before the recurring inspection requirements of the CMOM take effect, the Consent Decree requires Tyler to complete a one-time system-wide inspection and assessment of all 600 miles of pipes in its WCTS, within eight years[2] after entry of the Consent Decree as a final order (¶¶ 57-58); a system-wide inspection of all manholes within five years after the date of entry (¶ 59); a system-wide inspection of all lift stations within one year after the date of entry (¶ 65); and a system-wide inspection and inventorying of all force mains within one year after the date of entry (¶¶ 70-71). Each year Tyler must update its information management system with new data (Consent Decree ¶ 60) and plan and implement appropriate remedial measures to make necessary repairs or otherwise address the findings of the WCTS condition assessments (*Id.* ¶ 61-62). Based on the lift station and force main assessments, Tyler will also implement remedial measures at the lift stations and force mains. Consent Decree ¶¶ 66-74.

To address concerns of inadequate backup power, the Consent Decree requires Tyler to have and maintain backup power sources for all lift stations in the WCTS. *Id.* ¶ 64. To address

---

[2] To ensure steady completion, the Consent Decree requires Tyler to perform at least 75 miles of inspections and assessments each year.

the past presence of Constructed SSO Locations, the Consent Decree requires Tyler to identify

any additional Constructed SSO Locations that might exist during WCTS assessment or cleaning

activities required by the Consent Decree, to report any such identified locations within 2 days of

discovery (or notification), and to permanently remove them within 30 days after that. *Id*. ¶¶ 75-

76.

In addition to the injunctive relief requirements summarized above, the Consent Decree

requires Tyler to pay a total civil penalty of $563,000.00. Consent Decree ¶ 82. This total penalty

will be split equally by the United States and Texas (with $281,500.00 payable to each). *Id*.

¶¶ 82-84. Texas will also receive from Tyler a payment of $30,000 for attorney's fees. *Id*. ¶ 85.

Finally, Tyler must comply with reporting and certification requirements (*Id*. §§ IX-X) and will

be liable for stipulated penalties for violations of the Consent Decree (*Id*. § XI).

## STANDARD FOR ENTRY

In reviewing a proposed consent decree, the reviewing court is to ascertain whether the

decree is "fair, adequate and reasonable and is not the product of collusion." *Cotton v. Hinton*,

559 F.2d 1326, 1330 (5th Cir. 1977) (citing *Young v. Katz*, 447 F.2d 431 (5th Cir. 1971)).

Additionally, the court is to consider whether the decree is consistent with the objectives of the

statute under which the action was brought. *United States v. City of Miami*, 664 F.2d 435, 441

(5th Cir. 1981) (*en banc*, per curiam) (Rubin, J., concurring).[3] While "[t]he trial court in

approving a settlement need not inquire into the precise legal rights of the parties nor reach and

resolve the merits of the claims or controversy," it may not simply "sign on the line provided by

the parties." *City of Miami*, 664 F.2d at 440 and 441 n.13 (Rubin, J., concurring) (citation

---

[3] The standard for entry under Texas law is consistent with the federal standard. *See, e.g., Terrazas v. Ramirez*, 829 S.W.2d 712, 719 (Tex. 1991) ("When presented with a proposed consent decree . . . [t]he court must ascertain only that the settlement is 'fair, adequate and reasonable'") (quoting *City of Miami*, 664 F.2d at 441).

omitted). In making its determination, however, the court must not "substitute its judgment for that of the parties to the decree." *United States v. Wallace*, 893 F. Supp. 627, 631 (N.D. Tex. 1995) (citation omitted); *see also Ruiz v. McKaskle*, 724 F.2d 1149, 1152 (5th Cir. 1984). The court should exercise judicial discretion and consider the standard for entry to "assure[] itself that there has been valid consent by the concerned parties and that the terms of the decree are not unlawful, unreasonable, or inequitable." *United States v. City of Jackson*, 519 F.2d 1147, 1151 (5th Cir. 1975) (citation omitted).

When reviewing the consent decree against the standards for entry, a court may either approve or deny the proposed decree. *United States v. Colorado*, 937 F.2d 505, 509 (10th Cir. 1991). The judge "should not take it upon himself to modify the terms of the proposed settlement decree, nor should he participate in any bargaining for better terms." *Id*. The court "must be mindful that inherent in compromise is a yielding of absolutes and an abandoning of highest hopes." *Ruiz*, 724 F.2d at 1152 (internal quotation omitted).

In presenting the proposed Consent Decree to this Court, the parties recognize that "public policy strongly encourages the settlement of cases." *Ho v. Martin Marietta Corp.*, 845 F.2d 545, 547 n.2 (5th Cir. 1988). The Fifth Circuit is likewise sensitive to the "nation's investment in the resources consumed by the federal agencies in negotiating these decrees, as well as the chance [they provide parties to work together] justly to finalize a matter that otherwise would burden agencies and courts . . . ." *United States v. Allegheny-Ludlum Indus., Inc.*, 517 F.2d 826, 851 (5th Cir. 1975); *see also City of Jackson,* 519 F. 2d at 1151-1152 (negotiating a consent decree is a "highly useful tool for government agencies, since it maximizes the effectiveness of limited law enforcement resources . . . . [and allows the government to] avoid the risks as well as costs of full scale litigation of each point."). A

presumption in favor of voluntary settlements is "particularly strong where a consent decree has

been negotiated by the Department of Justice on behalf of a federal administrative agency like

EPA that enjoys substantial expertise in the environmental field." *United States v. Azko*

*Coatings*, 949 F.2d 1409, 1436 (6th Cir. 1991). In cases brought by the federal government, such

as this case, the Attorney General retains "considerable discretion in controlling government

litigation and in determining what is in the public interest." *United States v. Associated Milk*

*Producers, Inc.*, 534 F.2d 113, 117 (8th Cir. 1976).

With respect to Texas, the Attorney General of Texas generally has authority to settle

lawsuits on behalf of Texas. *See, e.g., Executive Condos., Inc. v. State*, 764 S.W.2d 899, 902

(Tex. App.—Corpus Christi 1989, pet. denied); Tex. Water Code § 7.110. Furthermore, "It is the

policy of [Texas] to encourage the peaceable resolution of disputes . . . and the early settlement

of pending litigation through voluntary settlement procedures." *In re Mabray*, 355 S.W.3d 16, 38

(Tex. App.—Houston [1st Dist.] 2010, no pet.) (*quoting* Tex. Civ. Prac. & Rem. Code §

154.002).

## THE PROPOSED SETTLEMENT MEETS THE STANDARD FOR ENTRY

In this case, the proposed Consent Decree meets the standards for entry. Additionally, the

one public comment received presents no additional considerations relating to the proposed

judgment indicating that either Plaintiff should withdraw or withhold consent to entry of the

consent decree. Accordingly, Plaintiffs move this Court to approve, sign, and enter the Consent

Decree as a final judgment.

### A.     The proposed Consent Decree is fair.

A consent decree must be both procedurally and substantively fair. *See United States v.*

*George A. Whiting Paper*, 644 F.3d 368, 372 (7th Cir. 2011); *United States v. Cannons Eng'g*

*Corp.*, 899 F.2d 79, 86 (1st Cir. 1990). As to each, the proposed Consent Decree meets the fairness standard.

### 1.    Procedural fairness

Procedural fairness examines whether the negotiations that produced the consent decree were conducted in good faith and at arm's-length. *See Wallace*, 893 F. Supp. at 632 and *United States v. BP Exploration & Oil Co.*, 167 F. Supp. 2d 1045, 1051 (N.D. Ind. 2001). To assess procedural fairness, courts consider the negotiation process, "weighing factors of candor, openness, and bargaining balance." *Wallace*, 893 F. Supp. at 632 (citing *Cannons Eng'g Corp.*, 899 F. 2d at 86). The inquiry should include consideration of whether each defendant was provided "ample opportunity to participate in the negotiations which produced the Consent Decree," and whether "arm['']s length settlement negotiations [were] conducted in good faith by experienced legal counsel representing" each party. *Wallace*, 893 F. Supp. at 632.

This settlement is procedurally fair. First, Tyler actively participated in the negotiations, which lasted for several years. Second, during those negotiations, each party was adequately represented by experienced counsel. Defendant retained outside counsel, who was supported by the City of Tyler's inside counsel and staff. Likewise, the United States was represented by attorneys from the Department of Justice who worked closely with EPA's technical and legal staff and retained experts. Similarly, Texas was represented by attorneys from the Texas Office of the Attorney General, who worked closely with TCEQ's technical and legal staff. Third, the negotiations were conducted at arm's length and in good faith. The effect of the proposed Consent Decree will be to require Tyler to implement remedial measures and maintain its WCTS in a manner designed to prevent further CWA, TWC, and TPDES permit violations and to protect its citizens' water quality. Finally, the Consent Decree was submitted for public comment, pursuant to both federal and State requirements, and no concerns of unlawfulness,

unfairness, or collusion were raised by the public. The Consent Decree reflects the parties'

careful and informed assessment of the relative merits of each other's positions, taking into

account the costs and risks associated with litigating this case through to judgment.

### 2.      Substantive fairness

In analyzing a consent decree for "substantive fairness," a court considers whether goals

of "corrective justice and accountability" are served by the decree. *See Wallace*, 893 F. Supp. at

632. The district court "should give the EPA's expertise the benefit of the doubt when weighing

[the] substantive fairness" of a consent decree providing some deference to the EPA's

experience. *Cannons Eng'g,* 899 F.2d at 88.

In this case, the Consent Decree is substantively fair. The Consent Decree addresses all of

the allegations within the Complaint through tailored injunctive relief and civil penalties

designed to discourage recurrence and hold Tyler accountable for past failures. Under the

proposed Consent Decree, Texas additionally recovers attorney's fees.

### B.      The proposed Consent Decree is adequate

The proposed Consent Decree is adequate because it is consistent with the goals of the

statutes giving rise to the allegations resolved by the Consent Decree, namely the CWA and the

TWC. The analysis of this factor, sometimes referred to as the "fidelity to the statute," overlaps

with the analysis involved in evaluating the other approval criteria. *Cannons Eng'g,* 899 F.2d at

90 ("consideration of the extent to which consent decrees are consistent with Congress'

discerned intent involves matters implicating fairness and reasonableness [because] . . . [t]he

three broad approval criteria were not meant to be mutually exclusive and cannot be viewed in

majestic isolation").

The CWA was enacted by Congress to "restore and maintain the chemical, physical, and

biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Similarly, the Texas

Legislature has declared through Tex. Water Code § 26.003 it is the policy of the State "to

maintain the quality of water in the state consistent with the public health and enjoyment, the

propagation and protection of terrestrial and aquatic life, and the operation of existing industries,

taking into consideration the economic development of the state." Both the CWA and the TWC

are in place to protect the integrity of federal and State waters and to protect the public and the

environment from water pollution. Here, the Consent Decree requires Tyler to make significant

operational and maintenance improvements to its WCTS and undertake these measures with the

goal of eliminating future SSOs. *See* Consent Decree ¶¶ 7-8. Keeping raw sewage out of local

waterways and the Tyler community furthers the statutory goals of the CWA and the TWC.

Importantly, the proposed Consent Decree meets these statutory goals without requiring

protracted litigation.

     **C.**     **The proposed Consent Decree is reasonable**

     Assessing the reasonableness of a consent decree in environmental litigation is "a

multifaceted exercise." *Cannons Eng'g,* 899 F.2d at 89. The Consent Decree is reasonable

because it is effective in addressing the claims pleaded in the Complaint and takes into

consideration the interests and risks involved with litigating those claims.

     In evaluating reasonableness, courts look first to the consent decree's expected

effectiveness in cleaning up the environment, whether it appropriately compensates the public,

and the relative strength of the parties' litigation positions. *United States v. Fort James*

*Operating Co.*, 313 F. Supp. 2d 902, 910 (E.D. Wis. 2004) (citing *Cannons Eng'g,* 899 F.2d at

89-90). Also potentially considered are the availability of alternatives to the consent decree and

the extent to which it serves the public interest and statutory purposes. *Fort James Operating Co.*

313 F. Supp. 2d at 910 (citing *BP Exploration*, 167 F. Supp. 2d at 1053). In evaluating

reasonableness, the reviewing court need not assess whether the government made the best possible settlement. *Cannons Eng'g,* 899 F.2d at 84.

Here, the proposed Consent Decree serves the public interest by providing appropriate remedies to resolve the allegations in the Complaint. Through the Consent Decree, Tyler will remedy currently-known and future-discovered inadequacies in its WCTS, improve employee training and procedures, and implement other actions to prevent future violations, protecting the public from exposure to sewage. Tyler will pay civil penalties to the United States and Texas for the alleged violations of the CWA and TWC. These penalties are designed to deter continuing or future violations of federal and State water laws and protect the public while taking into account Tyler's status as a local government operating a public water utilities system. Additionally, Tyler, appropriately, will be responsible for funding the costs of implementing the proposed Consent Decree's comprehensive injunctive measures. Finally, the proposed settlement resolves the parties' dispute without resort to prolonged litigation, which is a benefit to the parties, the Court, and the public.

**D.      The One Public Comment Received Presents No Grounds for Denying Entry of the Consent Decree**

In response to the published Federal Register notice, described *supra* on p. 1, the United States received one comment (attached as Exhibit A (with personally identifiable information redacted)) from Avis Scott, a Tyler citizen.[4] The commenter raised concerns regarding a "rotten egg odor" in her home and in her household drinking water, and referenced a TCEQ investigation from November 2016. Texas received no comments during its comment period.

---

[4] The United States also received an emailed question in response to the Federal Register notice from another individual seeking an explanation of the copying costs charged by the government for a hard copy of the consent decree. Although unrelated to the terms of the proposed Consent Decree, lead counsel for the United States responded to this inquiry by email.

13

The United States reviewed the public comment and, after consultation with Texas, concluded it raises drinking water concerns unrelated to the CWA claims in this action or to the Consent Decree, and does not provide a legal or factual basis to cause withdrawal of Plaintiffs' approval of the proposed lodged Consent Decree or for this Court to withhold its approval. Nonetheless, as set forth below, EPA, in coordination with the State, engaged with the commenter in an effort to address the issues raised in the comment.

### 1.    The Commenter's Submission

The commenter's submission identified her as a six-year resident of Tyler, Texas, and stated she was sending her comment "based on the violation of the CWA in the City of Tyler Water Utility." Exhibit A. After stating the concerns described above, she referenced a November 2016 TCEQ investigation that she understood to have "found the City of Tyler in violation of failure to maintain the disinfectant concentration." *Id*. The comment then references similar complaints reported by other Tyler citizens. *Id*. The commenter stated that she believed these incidences had associations with a City of Tyler 2015 drinking water quality report and the proposed Consent Decree. *Id*. She concluded by stating that the "CWA violation" resulted in her suffering certain health effects and by requesting a meeting to help solve her issues and discuss compensation for those in the community experiencing illness "if Tyler is request[ed] to pay a civil penalty." *Id*.

### 2.    Response to the Comment

Using the information provided by the commenter, EPA and TCEQ determined that the referenced investigations and reports all relate to drinking water, not releases or other problems related to Tyler's POTWs. The statutes at issue in the proposed settlement, the CWA and the TWC, do not regulate drinking water. Different federal (the Safe Drinking Water Act, 42 U.S.C. §§ 300f to 300j-26) and State (Chapter 341 of the Texas Health & Safety Code; 30 Tex. Admin.

Code Chapter 290) laws do regulate drinking water, but no claims under these statutes are alleged in the Complaint or resolved under the Consent Decree. Thus, any citizen concerns over the manner in which the City of Tyler operates its drinking water system do not relate to the proposed Consent Decree, which only addresses claims based on Tyler's ownership and operation of its sewer system, or provide a legal or factual basis to cause withdrawal of Plaintiffs' approval or support a finding by the Court that the proposed Consent Decree does not meets the standard for entry.

Nevertheless, counsel and staff for the case team representing the United States in this matter did refer the comment to the Drinking Water Section of EPA's Region 6 office in Dallas, Texas, on February 28, 2017. We have been advised that the comment was handled in accordance with the Drinking Water Section's normal procedures for handling citizen drinking water complaints, and that the appropriate section of TCEQ also reviewed the comment in consultation with EPA Region 6. EPA Region 6's Drinking Water Section responded to the commenter on March 15, 2017. See Exhibit B. The response explained that her comment related to drinking water quality, which is not regulated under the CWA or related to the Consent Decree in this case. The response further explained that all violations discussed in her comment were previously investigated by TCEQ and that, through State administrative orders issued by TCEQ in March and December of 2016, Tyler was required to remedy certain disinfection by-products rule violations and had since returned its system to compliance. The Drinking Water Section further provided contact persons to Ms. Scott should she have further questions.

### CONCLUSION

The proposed Consent Decree meets the standard for entry, the public comments did not disclose any basis for withdrawing Plaintiffs' consent, and Defendant has consented to entry. Therefore, the United States and Texas respectfully request that the Court approve and sign,

without a hearing or other further proceedings, the Consent Decree, which is attached to this

Motion as a proposed order, by signing in the space provided on page 82 and entering the Consent

Decree as a final judgment.

Respectfully submitted,

KAREN DWORKIN
Deputy Section Chief
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice


ROBYN E. HANSON
Lead Attorney; NY Bar No. 4462339
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
999 18th Street, South Terrace, Suite 370
Denver, CO, 80202
Ph: (303) 844-1558
Fax: (303) 844-1350
robyn.hanson@usdoj.gov

BRIT FEATHERSTON
Acting United States Attorney
Eastern District of Texas

JAMES GILLINGHAM
Assistant United States Attorney
TX Bar No. 24065295
1 10 N. College, Suite 700
Tyler, TX 75702
Phone: 903-590-1400
Fax: 903-590-1436
James.Gillingham@usdoj.gov

OF COUNSEL:

RUSSSELL W. MURDOCK
Assistant Regional Counsel
Office of Regional Counsel

U.S. Environmental Protect Agency, Region 6
1445 Ross Avenue, Suite 1200 (6RC-EW)
Dallas, Texas 75202

JAMES VINCH
Attorney
Water Enforcement Division
Office of Water Enforcement, Office of Enforcement and Compliance Assurance
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W. (2243A)
Washington, D.C. 20460

ATTORNEYS FOR PLAINTIFF,
UNITED STATES OF AMERICA


KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil
Litigation

PRISCILLA M. HUBENAK
Chief, Environmental Protection Division

_____
MARY E. SMITH
Lead Attorney
Assistant Attorney General
TX Bar No. 24041947
Mary.Smith@texasattorneygeneral.gov
Office of the Attorney General of Texas
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
Tel: (512) 475-4041
Fax: (512) 320-0911

EMILY PETRICK
Assistant Attorney General
TX Bar No. 24077709
Emily.Petrick@texasattorneygeneral.gov
Office of the Attorney General of Texas
Environmental Protection Division
P.O. Box 12548, MC-066
Austin, Texas 78711-2548
Tel: (512) 475-4041
Fax: (512) 320-0911

ATTORNEYS FOR PLAINTIFF,
STATE OF TEXAS

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2017, a copy of the PLAINTIFFS' UNOPPOSED MOTION TO ENTER THE CONSENT DECREE in the above-captioned case was filed and served through the Court's electronic case filing system.


*/s/ Robyn E. Hanson*